REBECCA WATSON et al. *v.* D. C. BLACKWOOD, Guardian, etc.

1. WILLS — CONSTRUCTION THEREOF. — Courts will look at the circumstances which surrounded the testator, and will through these means put themselves in his place, and then apply the terms of the instrument to its subject matter and objects.  2 Jarm. on Wills, p. 741.  All parts of a will are to be construed in relation to each other, so as to form, if possible, a consistent whole.  16 Vesey, 314.

2. SAME — SAME. — Although there may be apparent inconsistency in several parts of a will, yet if there be clearly discerned a general intent, that should prevail and overrule the particular — although the latter be first expressed.  The governing intent ought to control in the construction, if it can be made compatible with the import of the language used.  Chase v. Lockerman, 10 Gill & John., 206.

3. SAME — CASE IN JUDGMENT. — The testator in his will directed that his son by a former marriage, who was not living with the family and received no benefit from the estate during the life of the widow — to whom all the property was loaned for life — should have a certain slave at a fixed price, and to share equally in the estate.  *Held,* that the liens of such son should not be charged with the value of the slave before participating in the distribution of the estate.

APPEAL from the Chancery Court of Panola County. Hon. B. F. SIMMONS, Chancellor.

The facts of the above stated cause are substantially as follows: Elisha M. Watson died in 1852, after having made a last will, leaving considerable real and personal property. By the second clause of his will (see page 3 of the transcript), said testator "loaned " to his wife, Mary Watson, "all his estate, both real and personal," except a slave named William, for and during her natural life or widowhood, with power to sell his lands if she desired to do so, provided the proceeds were considered a part of his estate, and subject to distribution with the testator's other property, as directed in the will. By the third clause of the will, the testator directed that in case his wife, Mary Watson, should marry, his "estate" should be divided, giving her for life "one-third of the whole estate," and the other two thirds to be equally divided between the testator's children, as follows: "My son Jesse I positively wish to have a negro man William, as a part of his portion of my estate, and that negro man I wish delivered to him at my death, by my executrix, for him to be priced to him by good judges at a fair valuation, as a portion of his interest in my estate, to him and his heirs forever; and the rest of my children as I hereafter name them, to be equal legatees with him in my estate, to-wit," — then follow the names of seven of the testator's other children, not material to be given. (See pages 3 and 4 of transcript.)

Clause fourth directed that the children named above should receive a good English education out of the funds of the testator's estate, and should remain with their mother until they married or arrived at years of discretion. The seventh clause of the will is a substantial repetition of a portion of the third clause, above quoted. The eighth clause is as follows: "At the death of my wife, I wish my land sold and the proceeds arising therefrom equally divided between my children, Jesse Watson, and," naming the seven other "legatees " mentioned with Jesse in the third clause.

Mary Watson, the widow, never married, but remained on the place until her death in 1872. Jesse Watson, as the proof shows, received the slave William upon the death of the testator, and owned and used him for several years — until the slave was accidentally killed. The witnesses prove the slave to have been worth $800 or $900, though he was inventoried at $700. The inventory shows that all the slaves (including William) were worth about $7,500, and that all of them, with the exception of William, were held by the widow, under the will, until emancipated. Jesse Watson died some time before the death of Mary Watson, the widow, leaving one heir, who is the ward of appellee. After the death of the widow, the land of the testator was sold and the shares of all the legatees paid over to them, except Jesse Watson's share (or rather that going to his minor child), which was paid into court, under decree of the court, and ordered held until further decree in the premises. The appellee, as guardian of the heir of Jesse Watson, petitioned the chancery court to have this share paid over to her, and the appellants (the remaining legatees in the case) resisted the petition until the value of the slave received by Jesse Watson should be added to the proceeds of the land, and his share of the aggregate amount ascertained, and the value of the slave received by him, under the will, *deducted* from such full share. Upon hearing, the chancery court refused to charge Jesse Watson, or his heir, with the value of slave, and ordered a full share of the proceeds of the land sale paid to appellee as guardian as aforesaid. From this decree the case comes to this court, and the appellants assign for error the action of the court in ordering the money paid to appellee without first deducting the value of the slave received by Jesse Watson in his life time.

*Cooper & Hall* and *R. H. Taylor*, for appellants, insisted :

1. That the construction given to the will by the chancery court was based upon a single clause of the will and upon isolated words. That such a construction is repugnant to the well settled

rules bearing upon the construction of wills.   2 Jarm. on Wills., p. 742 ; Dean v. Nunnally, 36 Miss., 358.

2. That no part of a will can be rejected until every reasonable construction has been exhausted and it is certain that the different provisions of the will are irreconcilably repugnant.   Sorsby v. Vance, 36 Miss., 564; 1 Redfield on Wills, p. 430, et seq.; Cox v. Britt, 22 Ark., 567 ; Walker v. Walker, 17 Ala., 396 ; Pace et ux v. Bonner, 27 Ala., 307 ; Miller et ux. v. Flournoy, 26 Ala., 724 ; Lutz v. Lutz, 2 Blackford, 72 ; Kelly v. Stinson, 8 Blackford, 387 ; Baker v. Riley, 16 Ind., 479.

3. That while a testator may discriminate between the objects of his bounty, the presumption is against any such discrimination, and the will must be construed so as to maintain equality, in the absence of a plain and clear manifestation to the contrary.   Lassiter v. Wood, 63 N. C., 360; Wilcox v. Beecher, 27 Conn., 134 ; Lyon v. Acker, 33 Conn., 222; Smith's Appeal, 23 Penn., 9 ; Passmore's Appeal, 23 Penn., 381.

4. That the word " estate " in its ordinary sense means real as well as personal estate and when used in a will, it will carry realty as well as personalty.   2 Redfield on Wills, 308, et seq.; 17 Johns. (N. Y.), 281 ; Andrews v. Brumfield, 3 Geo., 117 and authorities there cited.   And to restrict the word estate to personalty there should be a clear expression of intention to that effect.   Same authorities.   That in the will the testator used the word estate in referring to both his realty and personalty, and such being his intention must govern in the construction of the will.

5. That the general intent of the testator gathered from the whole will was to make all the devisees equally the objects of his bounty.   That if Jesse Watson's estate was not chargeable with the value of a slave received by him from his father's estate immediately upon his death, as provided by the will, before he can share in the distribution of the fund arising from the sale of land of testator, the distribution would not be just or equal.   For by casualties, death, etc., all the personal property was destroyed and

none of the heirs but Jesse Watson received any benefit from the personalty.

*L. C. Balch* and *Walter & Scruggs*, for appellee, insisted :

1. That it is always competent to prove by parol the situation of the testator, the condition and character of the property, his surroundings and his relation to the subject with which he is dealing, so that the court can as near as may be realize the situation of the testator and thereby be better qualified to reach the meaning and instructions, through the language employed to express them. 43 Miss., 438, 454; 36 Miss., 564; 4 Kent's Com., p. 631.

2. That it was the intention of the testator that all of his children should share equally in his estate. That as Jesse living at a distance could not reap any benefit from the property "loaned" to the wife, which was to be used to maintain and educate the other children, the testator provided for him by directing the slave "William" to be delivered to him at the testator's death.

3. That equal justice could not be done and require Jesse to pay for the slave given to him and not require the other legatees to account for the personal property they took under the will. That all the personal property was worthless before the time arrived under the will for a general distribution of the estate, and to require Jesse to pay for "William" would be requiring him to account for what he received under a will bequeathing nothing.

SIMRALL, J., delivered the opinion of the court. ·

The single question litigated in this case is, whether the heir and distributee of Jesse Watson is entitled to share with the children of the testator, in the money raised by a sale of the land.

So much of the will as is necessary to be considered, in disposing of the subject, are extracted in "*hæc verba*" or substantially stated.

By the 2d item of the will, the testator gave to his widow, a

life estate in the " whole of his property, including both real and personal (except a slave William), determinable however upon her marriage, coupled with a power to dispose of the land, the proceeds to constitute a part of his estate and subject to distribution as thereinafter directed.

By the third clause, in the event of his widow's marriage, the testator directed his estate to be divided, so that the widow should have one-third for life, and the other two-thirds to be equally divided between his children (naming them), then follow these words: " My son Jesse Watson, I positively wish to have a negro man William, as a part of his portion of my estate, and that negro man I wish delivered to him at my death by my executrix, for him to be priced to him when delivered by good pages, at a fair valuation, as a portion of his interest in my estate ; to him and his heirs forever, and the rest of my children, as named to be equal legatees in my estate with him."

The 8th item directs, at the death of his widow, "that the lands be sold, and the money arising therefrom to be equally divided between Jesse Watson, and other children, naming them."

By the documentary evidence and depositions, it is shown that the testator died in August, 1852, the owner of a tract of land, thirteen slaves, stock, etc. Jesse Watson, to whom the slave William was bequeathed, was a son by a first marriage, and was living near his father, but not a member of his family. He took the slave William into possession the first of the year 1853, and continued to control and claim him, for several years, and until the slave lost his life by a casualty.

The other children, as directed by the will, resided with their mother upon the farm, and were maintained out of the property.

Courts will look at the circumstances which surrounded the testator—will through these means put themselves in his place— and then apply the terms of the instrument to its subject matter and objects. 2 Jarm. on Wills, 741; Brown v. Thorndike, 15 Pick., 400 ; Gilliam v. Chanceller & Murray, 43 Miss. Rep., 453.

All parts of the will are to be construed in relation to each other, so as to form, if possible, a consistent whole.  If several parts are absolutely inconsistent and repugnant, the latter must prevail.  2 Jarm. on Wills, 741; 16 Vesey, 314.

Athough there may be apparent inconsistency and incongruity in several parts, yet if there can be clearly discerned a general intent, that should prevail; and overrule the particular, although the former be first expressed.  The governing intent ought to control in the construction, if it can be made compatible with the import of the language used.  Chase v. Lockerman, 11 Gill & Johns., 206.

The widow died in 1872.  Since her death the land has been sold as ordered by the will.  The question in litigation is, whether the heir and distributee of Jesse Watson, deceased, represented by her guardian, should be charged with the value of the slave William, as so much received by her ancestor, before participating in the fund for distribution.

As we understand the record, if this grandchild is chargable as claimed by the other beneficiaries of the will, nothing will be coming to her out of the fund.

The motive of making an immediate gift of the slave William to his son Jesse, referred to with emphasis in two distinct clauses, was because this son was living away from the family, and all of the residue of the property was left to the widow for life, or during widowhood, for the support of herself and the maintenance of her children, the half brothers and sisters of Jesse.  Since he would derive no benefit from the general estate until the termination of the life or widowhood of Mrs. Watson, it seemed just to the father that so far as the personal property was concerned, he should at once be let into the enjoyment of what would approximate his share of it.

The governing intent to be gathered from the entire instrument must be adopted as the central idea, to give harmony and system to the testamentary plan.  So that lesser particulars seemingly incongruous, must give way, if absolutely necessary.

A prominent thought in the mind of the testator was to make his son by the first marriage, and his children by his last wife, equal participants in his property, so far as the necessities of his family would allow. The younger children were to be educated, and the widow provided for. Having but a small farm and but few slaves, these (with the exception of William) were to be kept together, by the widow, for that purpose. The power to sell the land, conferred by the second paragraph, was for the purpose of reinvestment, so that the proceeds of the land should constitute a part of his estate, and be subject to distribution as afterwards directed.

The third paragraph provided for the contingency of the widow's marriage, and directed in that event that the widow should have one-third for life, and the other two-thirds should go to his children, naming them ; then follow the words : " My son, Jesse Watson, I positively wish to have a negro man, William, as part of my estate— * * to be delivered to him immediately after my death— * * at a fair valuation— * * as a portion of his interest in my estate. * * * The rest of my children, as named, to be equal legatees in my estate with him."

The " estate " here referred to, means the personal, and does not include the real. The division enjoined, only embraces the personal property. The equality between the other legatees and Jesse, relates to that kind of property. This interpretation is strongly fortified by bringing into juxtaposition with it the paragraph immediately preceding and the 8th. The second item, after bestowing a life estate on the widow, gives her the power to sell, but charges the proceeds with a distribution, as afterwards directed. The power was evidently conferred that a reinvestment might be made in other lands. For the 8th paragraph directs a sale of the land at the death of the widow, and the money to be equally divided between Jesse and the children named.

The testator kept distinctly in his mind the two sorts of property which he was disposing of; the predominant purpose

as respects both was, that in each kind, when the time for division came, Jesse and his half brothers and sisters should share equally. No provision was made for the sale of the slaves in any contingency. The design was that they should be divided on the second marriage of the widow, or at her death; but when it was made, it must be on the terms of equality between Jesse and the other legatees.

So the second paragraph foreshadows a distribution of the land fund, which is developed in the eighth item, whether the land which the testator left at his death, or other land into which the widow may have converted it; a sale should be made and the money equally divided between Jesse and half brothers and sisters.

The difficulty of settling the rights of the parties grows out of the altered condition of the testator's estate, by reason of the emancipation of the slaves.

We have discovered from an analysis of different parts of the instrument, the purpose, studiously kept prominent, of equality among the beneficiaries. That intent can be effectuated in consonance with the language used, by holding, that the gift of the slave to Jesse was to be accounted for when the division of the personal estate was to have been made. It was observed in Lassiter *v.* Wood, 63 N. C. Rep., 363, that the general intent must be carried out, "and minor considerations when they come in the way must yield, especially so when the purpose is in consonance with reason and natural affection." In that case the bulk of the landed property was given to the sons in separate parcels, estimated to be worth to each $10,000. To his four daughters the testator gave pecuniary legacies of $10,000 each. Because of the emancipation of the slaves, the personal estate fell far short of paying the legacies. The general purpose deduced from the will was, that the testator intended to make equal provision for all his children. To give effect to that intent, the court resolved that the pecuniary legacies should be charged upon the

lands devised to the sons, so far as to produce equality among the children.

The governing motive with the testator, Joshua Watson, was, that the children of both mariages should share alike in the division of the slaves, and also in the distribution of the land fund. Emancipation has annihilated the former property, and there can be no adjustment of interests as respects it, such as was contemplated by the testator.

But equality will be observed and justice will be done by giving to the minor child of Jesse Watson, deceased, an equal share, with the other beneficiaries of the money arising from the sale of the land. Such was the decree of the chancellor, and it is affirmed.